# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>Property located at 3466 South 62nd Street,<br>Milwaukee, Wisconsin 53219; more fully<br>described in Attachment A.</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.<br>21-983M(NJ)</td></tr>
</table>

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Property located at 3466 South 62nd Street, Milwaukee, Wisconsin 53219; more fully described in Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), 21 USC 846, 21 USC 843(b), 18 USC 1956 | Possession with intent to distribute a controlled substance, conspiracy to possess with intent to distribute a controlled substance, use of communications facilities to facilitate controlled substance felonies, and money laundering. |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TODD HIGGINS (Affiliate)                 Digitally signed by TODD HIGGINS (Affiliate)
                                         Date: 2021.09.21 12:33:30 -05'00'

*Applicant's signature*

Todd Higgins, Task Force Officer, DEA

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/21/2021

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

## I. INTRODUCTION

I, Special Agent Todd Higgins, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent/Task Force Officer with the DEA and have been so since January 2018.  I am currently a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation and I have approximately 20 years of law enforcement experience. I have specialized training and experience in narcotics smuggling and distribution investigations. During my law enforcement career, I have participated in numerous narcotics investigations and have authored numerous affidavits supporting criminal complaints and search and seizure warrants. I have debriefed multiple defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with narcotics traffickers' methods of operation including communications via Facebook messenger, cellular telephone/smart phone applications, text messaging services, and other traditional forms of communications. I am further familiar with narcotics traffickers' methods including distribution, storage, importation, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking and money laundering.  In the course of my work, I have become knowledgeable with the enforcement of federal laws pertaining to narcotics and dangerous drugs. I have participated in drug trafficking investigations conducted by the Wisconsin Department of Justice, Division of Criminal Investigations (DCI), HSI, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances.  I am currently a member of the North Central High Intensity Drug Trafficking Area (HIDTA) Task Force assigned to the drug gang task force as an investigator

specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

2.      I am familiar with various methods of smuggling and trafficking controlled substances and their proceeds. I am also familiar with methods used to by traffickers to evade detection of both the controlled substances and its' proceeds. I have received training in the investigation of and am knowledgeable in investigations pertaining to drug trafficking, illegal firearm possession and trafficking, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.

3.      I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal search warrants for narcotic related offenses, which have resulted in the seizure of controlled substances, firearms, United States currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

4.      I have extensive training and experience in the investigation of Drug Trafficking Organizations (DTO). I am familiar with the different structures, the motivations for criminal their activities, the hierarchies, and the variety of roles of the members within the organizations. I have applied my training in the investigation of these organizations and have charted and tracked them.

My investigations have revealed the geographical locations that they inhabit, the level of violence and crimes they have committed and their hierarchy and the roles of their members within their respective organizations. I have participated in these types of investigations as both the lead investigator and co-agent and have successfully dismantled them by use of several law enforcement investigation techniques to include wiretaps.

5. In addition, through training, experience, and discussions with other experienced agents:

a. I have learned about the manner in which individuals and organizations distribute controlled substances;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages, and outbuildings), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m.  I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs in their possession;

n.  I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded; and

o.  During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject PREMISES. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

6.  Pursuant to my official duties, I am submitting this affidavit in support of an application for a search warrant for violations of federal laws, including violations of Title 21, United States Code, Sections 841(a)(1), and 846, Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; Title 21, United States Code, Section 843(b), Use of a Communication Facility to Facilitate a Felony Drug-Trafficking Offense; and, Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h), i.e., Money Laundering and Conspiracy to Launder Monetary Instruments.

7.  I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this

affidavit are based on my knowledge and, in part, information provided by LEOs, including (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking investigators; (d) physical surveillance by the DEA, Homeland Security Investigations (HSI), and local law enforcement agencies, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for the DEA, HSI, and North Central HIDTA; (h) consensually-recorded phone calls between a confidential source and investigative targets; (i) controlled purchases of heroin and fentanyl; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement databases; (l) my training and experience as a DEA TFO; (m) the training and experience of other LEOs involved in this investigation; (n) and intercepted wire and electronic communications that have been translated from Spanish to English.

8.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.  Because this affidavit is being submitted for the limited purpose of securing search warrants and a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred and that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II.	PROPERTIES FOR WHICH SEARCH WARRANTS ARE SOUGHT

9.	For the reasons discussed herein, there is probable cause to believe that located at and in the following property (hereinafter the "**PREMISES**"), more fully described in Attachment A, are items that constitute evidence of drug trafficking, including violations of Title 21, United States Code, Sections 841, 846, and 843(b); and money laundering, Title 18 United States Code, Sections 1956.

> **3466 South 62nd Street, Milwaukee, Wisconsin 53219**; is a residence owned by, and/or possessed by, and/or associated with Javier MERCED. The property is a one story, single family residence with approximately 1,196 square feet of finished living area, located in a southern portion of a cul de sac. The exterior is described as having off white vinyl siding, white trim around the windows, and a grey shingle rooftop. The numbers "**3466**" are affixed in a horizontal fashion, in bolded black numbering, along white trim directly above the main entrance facing north. There is a concrete sidewalk leading to the landing in front of the entry door. The front entry door is north facing and brown in color.  The driveway and garage are located to the east of the residence. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

10.	 The following sub-sections set forth various types of information obtained during this investigation regarding the locations and persons described above.  Such information includes, but is not limited to the following: (1) information obtained from confidential sources; (2) surveillance; (3) recorded conversations; and (4) physical surveillance.

11.	The United States, including HSI and the DEA, is conducting a criminal investigation of Rene SUAREZ (a/k/a "Pelon"), Jose Alberto SILVA-Jimenez, Javier MERCED and others regarding possible violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute heroin and distribution of heroin); Title 21, United States Code, Section 843(b) (use of communications facilities to facilitate felony drug-trafficking offenses); and Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h) (Money Laundering and Conspiracy to Launder Monetary Instruments)**.**

### III.    PROBABLE CAUSE

12.    In April 2019, members of North Central High Intensity Drug Trafficking Area (HIDTA) DEA Group 63 and Group 68, along with the West Allis, WI Police Department, initiated an investigation into individuals distributing heroin throughout Milwaukee, Wisconsin.  HIDTA identified the individuals involved in this heroin distribution as, among others, Jose Alberto SILVA-Jimenez, Rene SUAREZ (a/k/a "Pelon") and Javier MERCED.

CS-1 Information

13.    In April 2019, a confidential source (hereinafter CS-1) provided information to law enforcement naming Jose Alberto SILVA-Jimenez as a heroin distributor and broker facilitating heroin transactions in Milwaukee, WI.  CS-1 has prior arrests in Puerto Rico for Dangerous Drugs – Tentative or Conspiration Marijuana, Weapons Law (Aggravated) – no disposition; and prior arrests in Wisconsin for Maintain a Drug Trafficking Place, and Possession with Intent to Distribute cocaine, heroin and THC – charges remain pending.

Controlled Purchases Involving SILVA-Jimenez, MERCED and SUAREZ

<em>April 30, 2019 Controlled Purchase</em>

14.    On April 29, 2019, CS-1 notified law enforcement that SILVA-Jimenez offered to sell CS-1 an ounce of heroin for $1,800.  Prior to the drug transaction, SILVA-Jimenez instructed CS-1 to call him when CS-1 was near the area of 95th and Oklahoma Street in Milwaukee, WI.  On April 30, 2019, CS-1 met with SILVA-Jimenez at the Evergreen Village apartments located at 96th and Oklahoma Street.  Law enforcement observed SILVA-Jimenez enter a garage, close the door and emerge a short time later after calling CS-1.  Law enforcement saw SILVA-Jimenez entering CS-1's vehicle where he provided CS-1 approximately 25.02 grams of a brown substance, which later field-tested positive for the properties of heroin.

*May 22, 2019 Controlled Purchase*

15.     On May 22, 2019, CS-1 informed law enforcement SILVA-Jimenez had called CS-1.  SILVA-Jimenez explained to CS-1 that he was currently in Puerto Rico and would be returning to Milwaukee, WI at the end of the month.  SILVA-Jimenez further explained to CS-1 that he could arrange a heroin transaction if CS-1 wanted to purchase heroin for further distribution.  At the direction of law enforcement, CS-1 agreed to purchase 20 grams of heroin from SILVA-Jimenez for $1,400.  On May 22, 2019, SILVA-Jimenez instructed CS-1 to park in the area of North 19th and Highland Avenue in Milwaukee, WI.  Once in that area, SILVA-Jimenez called CS-1 and said SILVA-Jimenez's "worker," wearing a burgundy shirt and hat, would be the person supplying the heroin to CS-1.  A short time later, law enforcement observed an Hispanic male, who matching SILVA's description of the "worker," exit the apartment complex located at 1924 W. Highland Avenue.  CS-1 met the unknown Hispanic male at the apartment complex's perimeter fence and conducted the heroin transaction.  The unknown Hispanic male provided CS-1 with approximately 20.02 grams of a brown substance, which field-tested positive for the properties of heroin.

*July 22, 2019 Controlled Purchase*

16.     On July 22, 2019, CS-1 informed law enforcement SILVA-Jimenez offered to sell CS-1 an ounce of heroin for $1,900.  SILVA-Jimenez had returned to Milwaukee from his trip to Puerto Rico.  At the direction of law enforcement, CS-1 agreed to purchase the heroin from SILVA-Jimenez.  Similar to the April 30, 2019 heroin transaction, SILVA-Jimenez instructed CS-1 to meet SILVA-Jimenez at the Evergreen Village apartment complex.  CS-1 contacted SILVA-Jimenez upon arrival to the Evergreen Village apartments.  Shortly thereafter, law enforcement observed SILVA-Jimenez exit the apartment complex and enter CS-1's vehicle.  SILVA-Jimenez

provided CS-1 with three plastic baggies containing a brown substance. After the drug transaction, the brown substance, weighing approximately 26.82 grams, tested positive for the properties of heroin.

*March 4, 2020 Controlled Purchase*

17.    On March 3, 2020, CS-1 informed law enforcement SILVA-Jimenez had once again returned to Puerto Rico. CS-1 told law enforcement during a phone conversation that SILVA-Jimenez offered to sell CS-1 25 grams of heroin for $1,750. SILVA-Jimenez would provide CS-1 the telephone number for SILVA-Jimenez's "worker," who would conduct the heroin transaction with CS-1 in SILVA-Jimenez's absence. On March 4, 2020, SILVA-Jimenez texted CS-1 the telephone number for the "worker." Later that same day, CS-1 called the "worker." CS-1 and the "worker" agreed to meet at an Amaco gas station near South 60th Street and West Oklahoma Avenue in Milwaukee. Law enforcement surveillance units observed a blue BMW arrive at the Amaco gas station. CS-1 then arrived to the gas station. An Hispanic male was seen exiting the blue BMW and entering CS-1's vehicle. The Hispanic male (i.e., the "worker") provided CS-1 three baggies, individually labeled, "10," "10," and "5." All three baggies weighed approximately 24.81 grams and contained a brown substance, which field-tested positive for the properties of heroin. Law-enforcement records checks revealed that the blue BMW driven by the "worker" was registered to Jose SILVA-Jimenez. After the heroin transaction, law enforcement positively identified the "worker" as Javier MERCED. Law enforcement followed MERCED to the residence of 3466 S. 62nd Street, Milwaukee, Wisconsin (the "PREMISES"). Law-enforcement records checks associated MERCED with the residence and MERCED's Wisconsin Driver's license lists the PREMISES as his address. The photograph depicted on

MERCED's driver's license matches the individual observed by law enforcement on the day of the aforementioned heroin transaction.

*September 1, 2020 Controlled Purchase*

18.     On July 16, 2020, CS-1 informed law enforcement SILVA-Jimenez had called CS-1 from Puerto Rico.  During the call, SILVA-Jimenez provided CS-1 telephone number (661) 218-1188, which was the phone number for SILVA-Jimenez's heroin source-of-supply in Chicago, IL. SILVA-Jimenez told CS-1 the source-of-supply would be expecting a phone call from CS-1 to arrange a future heroin transaction.  On July 17, 2020, CS-1 placed a recorded call to (661) 218-1188.  During the recorded conversation in Spanish, the source-of-supply only identified himself as "Pelon."  "Pelon" agreed to sell 50 grams of heroin to CS-1 for $3,500.  According to CS-1, SILVA-Jimenez previously explained that he always conducted his heroin transactions with "Pelon" at a George Webb restaurant in the area of 92nd and Oklahoma Street in Milwaukee, WI. SILVA-Jimenez further explained to CS-1 that "Pelon" would deliver no less than 50 grams of heroin from Chicago, IL to Milwaukee, WI.  During the July 17, 2020 recorded call, CS-1 and "Pelon" agreed to meet at the aforementioned George Webb restaurant to conduct the heroin transaction on July 20, 2020.  On July 20, 2020, law enforcement met with CS-1 to arrange the heroin transaction for that morning.  The transaction was canceled, however, because "Pelon" had vehicle issues during his travel from Chicago to Milwaukee.

19.     On August 27, 2020, CS-1 placed a recorded to SILVA-Jimenez.  During the recorded call, SILVA-Jimenez explained to CS-1 that "Pelon" was concerned about traveling between Illinois and Wisconsin due to COVID-19 pandemic restrictions.  CS-1 informed SILVA-Jimenez there were currently no COVID-19 travel restrictions between the respective states. SILVA-Jimenez informed CS-1 that he would contact "Pelon" and arrange the transaction.  On

August 28, 2020, CS-1 informed law enforcement that SILVA-Jimenez arranged a 50-gram heroin transaction with PELON, which would be conducted at the Lake Forest Oasis in IL.

20.    On September 1, 2020, CS-1 placed a recorded call to SILVA-Jimenez advising SILVA-Jimenez that CS-1 was prepared for the transaction and would be on time. Law enforcement subsequently observed CS-1 meet "Pelon" at the McDonald's restaurant inside the Lake Forest Oasis. CS-1 provided "Pelon" money, which was concealed inside a McDonald's bag. "Pelon" informed CS-1 the heroin was located inside a Dunkin' Donuts bag, which he provided to CS-1. After the transaction, CS-1 gave the Dunkin' Donuts bag to law enforcement. The Dunkin' Donuts bag contained approximately 50.23 grams of a brown substance, which field-tested positive for the properties of heroin.

*October 27, 2020 Controlled Purchase*

21.    On October 21, 2020, CS-1 contacted SILVA-Jimenez. Over a series of recorded conversations, SILVA-Jimenez and CS-1 agreed to a 100-gram heroin transaction for $6,000 to be conducted with "Pelon." SILVA-Jimenez brokered the heroin transaction from Puerto Rico and arranged for CS-1 to again meet "Pelon" at the Lake Forest Oasis on October 27, 2020.

22.    On October 27, 2020, law enforcement observed a black Cadillac Escalade bearing IL license plate ROXSAND. The driver of the Escalade resembled "Pelon." According to law enforcement databases, the Cadillac Escalade bearing IL license plate ROXSAND is registered to "ROXSAND HAULING CONTRACTORS," 4319 N Central Park Avenue, Cicero, IL 60618, and in the name Rene SUAREZ. Law enforcement record checks of SUAREZ indicate IL driver's license S62072088153 with the same registered address as the Cadillac Escalade. The person represented in the IL driver's license photograph for SUAREZ was confirmed to be the same

individual observed by law enforcement at the Lake Forest Oasis on September 1, 2020 and October 27, 2020. In other words, SUAREZ was "Pelon."

23. On October 27, 2020, law enforcement observed CS-1 meeting SUAREZ at the McDonald's restaurant inside the Lake Forest Oasis. Law enforcement observed CS-1 give a McDonald's bag, which contained $6,000, to SUAREZ. In exchange, law enforcement observed SUAREZ provide CS-1 a Dunkin' Donuts bag. On this occasion, SUAREZ gave CS-1 his telephone number, i.e., (312) 834-6433. SUAREZ told CS-1 to contact SUAREZ on the provided cellular number for future heroin transactions. After the transaction, CS-1 provided law enforcement the Dunkin' Donuts bag. The bag contained approximately 100.7 grams of a brown substance, which field-tested positive for the properties of heroin.

24. Law enforcement subsequently served a Subpoena to T-Mobile USA, which was the service provider for (312) 834-6433. Subpoena results from T-Mobile USA indicated (312) 834-6433 was registered to Rene SUAREZ, 4319 N. Central Park Avenue, Chicago, Illinois 60618.

*Additional Controlled Purchases involving CS-1, SUAREZ, and MERCED*

25. Between October 27, 2020 and June 23, 2021, CS-1 conducted seven controlled purchases of heroin from SUAREZ. On October 27, 2020, CS-1 purchased 100.7 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Lake Forest, Illinois. On December 10, 2020, CS-1 purchased 112.84 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Pleasant Prairie, Wisconsin. On February 9, 2021, CS-1 purchased 107.18 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Lake Forest, Illinois. On March 19, 2021, CS-1 purchased 102.3 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Lake Forest, Illinois. On April

28, 2021, CS-1 purchased 104.4 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Pleasant Prairie, Wisconsin. On May 27, 2021, CS-1 purchased 104.5 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Pleasant Prairie, Wisconsin. On June 23, 2021, CS-1 purchased 103.47 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Pleasant Prairie, Wisconsin. On August 26, 2021, CS-1 purchased 102.22 grams of a substance that field-tested positive for heroin from SUAREZ for $6,000 in Pleasant Prairie, Wisconsin.

Surveillance of MERCED and additional evidence Involving MERCED and SUAREZ

26.     On February 25, 2021 at approximately 11:00 a.m. TFO Nick Stachula located MERCED while on Surveillance. TFO Nick Stachula observed MERCED occupying the White 2003 Chevrolet Express G1500 van, bearing Wisconsin registration plates AJL6971. TFO Nick Stachula observed MERCED park the van at the **PREMISES** where he observed MERCED exit the van and enter the residence. On March 1, 2021 at approximately 11:00 a.m. while on surveillance, TFO Sean Mayerbock located MERCED. TFO Mayerbock observed MERCED occupying the white van**.** While on surveillance, TFO Sean Mayerbock observed MERCED drive to and park the van at the **PREMISES** where he observed MERCED exit the van and enter the residence. A check of the white van through the Wisconsin Department of Transportation showed the van was registered to MERCED, who resided at 3466 S. 62nd Street, Milwaukee, Wisconsin (i.e., the **PREMISES**).

27.     On February 19, 2021, CS-1, under the direction and control of law enforcement, made a recorded call to SUAREZ. During the call, CS-1 complained to SUAREZ about the quality of heroin purchased from SUAREZ on February 9, 2021. On March 9, 2021, in a subsequent recorded conversation, SUAREZ advised CS-1 that he would travel to Milwaukee to provide CS-

1 with a sample of heroin to ensure that CS-1 was satisfied with the quality of heroin for future purchases. On March 10, 2021, at approximately 7:45 a.m., relying upon location data for SUAREZ's cellular telephone, investigators located SUAREZ, who had driven northbound on Interstate 41 in his black Cadillac Escalade bearing Illinois plate "ROXSAND," near Ryan Rd in Oak Creek, Wisconsin. Investigators followed the black Cadillac until it exited on South 60th Street. Investigators observed the black Cadillac stop to get fuel at the Speedway Gas Station located at 4265 South 60th Street, Greenfield, Wisconsin before continuing to drive northbound on South 60th Street. Based on surveillance and data obtained from GPS monitoring, investigators believe SUAREZ was possibly driving to MERCED's residence, which is located at the **PREMISES**. At approximately 8:00 a.m., as investigators followed the black Cadillac, TFOs Mayerbock and Stachula arrived near the **PREMISES** in anticipation of SUAREZ's arrival at the residence. At approximately 8:08 a.m., TFOs Mayerbock and Stachula observed the black Cadillac arrive at the **PREMISES**. At approximately 8:22 a.m., TFOs Mayerbock and Stachula observed the black Cadillac depart the **PREMISES**.

28. After leaving the **PREMISES**, SUAREZ travelled to the area of S. 92nd St. and W. Beloit Ave., Milwaukee, Wisconsin where SUAREZ had agreed to meet CS-1 to provide the heroin sample. CS-1 parked his vehicle near the black Cadillac, and investigators observed SUAREZ exit the black Cadillac and enter the front passenger seat of CS-1's vehicle. During the controlled meet, SUAREZ informed CS-1 that SUAREZ was concerned that he had been followed by law enforcement. SUAREZ then provided CS-1 a plastic baggie containing a grayish tan substance. SUAREZ then exited the CS-1's vehicle, returned to the black Cadillac, and then departed the area. The plastic baggie contained approximately 1.79 grams of a substance, which field-tested positive for the properties of heroin.

29.     Both location data (i.e., E-911/GPS information) derived from SUAREZ's cellular device and physical surveillance have disclosed that SUAREZ made reoccurring trips to the **PREMISES**, which is MERCED's residence. For instance, based on GPS/E-911 data, investigators believe that SUAREZ travelled to Milwaukee to meet with MERCED on April 2, 2021, April 11, 2021, and on May 8, 2021. These trips were short, ranging from 45 minutes to 1.5 hours. Based on training and experience, your Affiant believes SUAREZ delivers illegal drugs to MERCED at the **PREMISES** and/or retrieves illegals drugs and drug proceeds from MERCED at the **PREMISES**.

30.     On September 8, 2021, for approximately an hour, TFO Nick Stachula conducted surveillance at the **PREMISES**. While on surveillance, TFO Stachula observed a white Chevrolet van bearing Wisconsin plates AJL-6971, which is MERCED's known work van, and a silver BMW X5 SUV, registered to Gloria Margarita VARGAS-CASTRO, whose listed address is the **PREMISES**. Both vehicles were parked on the street, in front of the **PREMISES**, which is MERCED's residence.

31.     TFO Sean Mayerbock conducted a Facebook search on MERCED's Facebook page. TFO Mayerbock located a picture, dated November 10, 2019, of MERCED and VARGAS-CASTRO together with a caption in Spanish, translated in English as, "More pics here with my headache brother-in-law." Based on this information, investigators believe VARGAS-CASTRO is MERCED's sister-in-law.

32.     On September 17, 2021, at approximately 8:10 a.m., TFO Stachula conducted surveillance at the **PREMISES**. On this occasion, TFO Stachula observed a red 2003 Dodge Ram 1500 pick-up truck, bearing Wisconsin plates PM8702 (registered to Gloria VARGAS-CASTRO, whose listed residence was the **PREMISES**), parked in the driveway. At approximately 8:17 a.m.,

TFO Stachula observed MERCED departing the **PREMISES** in the Dodge truck.  MERCED was the sole occupant of the Dodge truck, which was captured on video.

*MERCED identified as the user of (414) 595-5885*

33.     Investigators issued a subpoena for information related to the telephone number (414) 595-5885. Investigators later discovered that the telephone number is subscribed to JM CONSTRUCTION & PAINTING SERVICES LLC, with a listed address of 3466 S. 62nd Street, Milwaukee, Wisconsin 53219 (the **PREMISES**).  Based on state records indicating that MERCED was the registered agent for JM CONSTRUCTION & PAINTING SERVICES LLC and given the subscriber address for (414) 595-5885 was the PREMISES (MERCED's residence), investigators believe MERCED was the user of (414) 595-5885.

Intercepted communications between MERCED and SUAREZ

*Authorized Wire and Electronic Intercepts*

34.     On June 15, 2021, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge Pamela Pepper, Eastern District of Wisconsin, to intercept wire and electronic communications (Application Number 21-ap-4) for the cellular telephone assigned number (312) 834-6433 (TARGET TELEPHONE-1), used by SUAREZ.  The interception of wire and electronic communications on TARGET TELEPHONE-1 ended on July 15, 2021.

35.     On July 15, 2021, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge Pamela Pepper, Eastern District of Wisconsin, to continue intercepting wire communications (Application Number 21-ap-4) for the cellular telephone assigned number (312) 834-6433 (TARGET TELEPHONE-1), used by SUAREZ, and to initiate the interception of wire communications for the cellular telephone

assigned number (305) 519-3635 (TARGET TELEPHONE-2) used by Nickolas MITCHELL, and the cellular telephone assigned number (574) 202-1874 (TARGET TELEPHONE-3) used by Manuel Salvador REYES-SOTO. The interception of wire communications on TARGET TELEPHONE-1, TARGET TELEPHONE-2, and TARGET TELEPHONE-3 ended on August 13, 2021.

36.     On August 17, 2021, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge Pamela Pepper, Eastern District of Wisconsin, to continue intercepting wire communications (Application Number 21-ap-4) for the cellular telephone assigned number (312) 834-6433 (TARGET TELEPHONE-1), used by Rene SUAREZ, and the cellular telephone assigned number (574) 202-1874 (TARGET TELEPHONE-3) used by Manuel Salvador REYES-SOTO. The interception of wire communications on TARGET TELEPHONE-1 and TARGET TELEPHONE-3 ended on September 15, 2021.

*SUAREZ and MERCED Discuss Heroin*

37.     On August 9, 2021, at 11:11 a.m., SUAREZ, using TARGET TELEPHONE-1, received a call from (414) 595-5885, used by MERCED.  During the intercepted call, MERCED said, "[H]ey, I met up with my guy from here that I had working with that paint and he is willing to work."  SUAREZ asked, "You have him?"  MERCED replied, "Yes."  SUAREZ said, "Alright, then I'll go tomorrow."  MERCED responded, "Okay."  Based on training and experience, your Affiant believes MERCED made a coded reference to heroin "(i.e., "paint") and indicated he had a customer willing to purchase the drug for further distribution.  Your Affiant further believes SUAREZ indicated that he was willing to meet with MERCED the next day in order to supply him with heroin.

IV. **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

38.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39.     *Probable cause.* I submit that if a computer or storage medium is found on the **PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **PREMISES** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal

information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy

evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.     I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both

as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a **PREMISES** for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the **PREMISES**, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on **PREMISES** could be unreasonable. As explained above, because

the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **PREMISES**. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

42. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

43.     Because multiple people may share the **PREMISES** as a residence, it is possible that the **PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

44.     *Unlocking Apple brand devices:* I know based on my training and experience, as well as from information found in publicly available materials including those published by Apple, that Apple devices are used by many people in the United States, and that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

      a.    If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device

are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

b.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

c.  If Touch ID enabled Apple devices are found during a search of the **PREMISES**, the passcode or password that would unlock such the devices are presently unknown to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of any Apple device(s) found during the search of the **PREMISES** to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

d.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of the **PREMISES** without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the **PREMISES** to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the **PREMISES** in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

e.  Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found in the **PREMISES** as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

45.  Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the **PREMISES** to the Touch ID sensor of

the Apple brand device(s), such as an iPhone or iPad, found at the **PREMISES** for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

### V.    CONCLUSION

46.    Based on the forgoing, believe that there is probable to believe that located at and in the property described in Attachment A, there is evidence of drug trafficking and fruits, instrumentalities and proceeds of drug trafficking, all of which is detailed more specifically in Attachment B, Items to be Seized.

**ATTACHMENT A**

**3466 South 62nd Street, Milwaukee, Wisconsin 53216** is a one story, single family residence with approximately 1,196 square feet of finished living area, located in a southern portion of a cul de sac. The exterior is described as having off white vinyl siding, white trim around the windows, and a grey shingle rooftop. The numbers "**3466**" are affixed in a horizontal fashion, in bolded black numbering, along white trim directly above the main entrance facing north. There is a concrete sidewalk leading to the landing in front of the entry door. The front entry door is north facing and brown in color. The driveway and garage are located to the east of the residence. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin.



# ATTACHMENT B

## *Items To Be Seized*

1. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

3. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

4. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

5. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

6. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

7. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

9. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and

any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

10. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

11. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

12. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

13. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).